**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **EVERGLADES HARVESTING** | ) |
| **AND HAULING, INC.,** *et al.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) **Civil Case No. 19-3291 (RJL)** |
| **v.** | ) |
| | ) |
| **EUGENE SCALIA, sued in his** | ) |
| **official capacity,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

**MEMORANDUM OPINION**
(December 16, 2019) [#5]

On October 31, 2019, Plaintiffs Everglades Harvesting and Hauling, Inc.

("Everglades"), Statewide Harvesting and Hauling, LLC ("Statewide"), Florida Fruit and

Vegetable Association ("FFVA"), Florida Citrus Mutual, and National Council of

Agricultural Employers ("NCAE") (collectively, "plaintiffs") filed suit against the United

States Secretary of Labor, Eugene Scalia ("the Secretary"), and the Assistant Secretary of

Labor for Employment and Training Administration, John P. Pallasch (collectively,

"defendants"), alleging violations of the Administrative Procedure Act ("APA"), 5

U.S.C. § 551, *et seq. See* Compl. [Dkt. #1] ¶¶ 29–36. Six days later, plaintiffs filed a

Motion for Temporary Restraining Order and Motion for Preliminary Injunction ("Mot.

for P.I."). *See* Mot. for P.I., Nov. 6, 2019 [Dkt. #5]. The following day, I held a hearing

at which I heard argument on and, ultimately, denied the TRO. *See* Civ. Case No. 19-

3291, Minute Entry, Nov. 7, 2019. The parties briefed the motion for P.I., and this Court

1

heard argument from both sides on November 21, 2019. *See* Civ. Case No. 19-3291,

Minute Entry, Nov. 21, 2019. After review of the pleadings, oral argument, and the

entire record, I hereby GRANT the motion for P.I. for the reasons set forth below. *See id.*

## BACKGROUND

### I.     The H-2A Program and its Statutory and Regulatory Framework

The "H-2" temporary foreign worker program dates back to the original enactment

of the Immigration and Nationality Act ("INA") in 1952. *See* Pub. L. 82-414 §

101(15)(H)(ii) (June 27, 1952).[1] The Immigration Reform Control Act of 1986 ("IRCA")

later split the H-2 program into two components: H-2A for temporary agricultural

workers and H-2B for nonagricultural workers. *See* Pub. L. 99-603 § 301(a).[2] In 2005,

this portion of the INA was slightly modified once again. *See* Pub. L. 109-90 § 536 (Oct.

18, 2005). This portion of the INA now defines the term "immigrant" to include:

> an alien having residence in a foreign country which he has no intention of
> abandoning who is coming temporarily to the United States to perform
> agricultural labor or services, as defined by the Secretary of Labor in
> regulations and including agricultural labor defined in section 3121(g) of
> title 26 [the Internal Revenue Code], agriculture as defined in section 203(f)
> of title 29 [the Fair Labor Standards Act], and the pressing of apples for
> cider on a farm, of a temporary or seasonal nature.

---

[1] This provision of the INA defined the term "immigrant" to include "an alien having
residence in a foreign country which he has no intention of abandoning . . . who is
coming temporarily to the United States to perform other temporary services or labor, if
unemployed persons capable of performing such service or labor cannot be found in this
country."

[2] This provision of the IRCA replaced the phrase "to perform other temporary services or
labor" in the original section with "to perform agricultural labor or services, as defined by
the Secretary of Labor in regulations and including agricultural labor denied in section
3121(g) of the Internal Revenue Code of 1954 and agriculture as defined in section 3(f)
of the Fair Labor Standards Act of 1938 . . . of a temporary or seasonal nature."

8 U.S.C. § 1101(a)(15)(H)(ii)(a).

Pursuant to the statutory directive above, the Department of Labor ("DOL") has promulgated a number of different definitions of "agricultural labor or services" over the years. *See, e.g.*, 52 FR 20496 (June 1, 1987); 73 FR 8538, 8555 (Feb. 13, 2008); 73 FR 77110, 77212 (Dec. 18, 2008); 75 FR 6884, 6887–6889 (Feb. 12, 2010). The current version of the regulations, adopted in 2010, almost mirrors the statute, defining "agricultural labor or services" as (additions to the statutory definition italicized):

> agricultural labor as defined *and applied* in sec. 3121(g) of the Internal Revenue Code of 1986 at 26 U.S.C. 3121(g); agriculture as defined *and applied* in sec. 3(f) of the Fair Labor Standards Act of 1938 (FLSA) at 29 U.S.C. 203(f); the pressing of apples for cider on a farm; *or logging employment. An occupation included in either statutory definition is agricultural labor or services, notwithstanding the exclusion of that occupation from the other statutory definition.*

20 C.F.R. § 655.103(c) (emphasis added). As relevant here, the definition of "agricultural labor" under IRC § 3121(g)(1):

> includes all service performed . . . on a farm, in the employ of any person, in connection with cultivating the soil, or in connection with raising or harvesting any agricultural or horticultural commodity, including the raising, shearing, feeding, caring for, training, and management of livestock, bees, poultry, and fur-bearing animals and wildlife;

26 U.S.C. § 3121(g)(1). The DOL has not adopted any of its own regulations further elaborating on the meaning of IRC § 3121(g)(1), but the Department of the Treasury has:

> (1) Services performed on a farm by an employee of any person in connection with any of the following activities constitute agricultural labor:
> (i) The cultivation of the soil;
> (ii) The raising, shearing, feeding, caring for, training, or management of livestock, bees, poultry, fur-bearing animals, or wildlife; or

3

> (iii) The raising or harvesting of any other agricultural or
> horticultural commodity.
>
> (2) Services performed in connection with the production or harvesting of
> maple sap, or in connection with the raising or harvesting of mushrooms, or
> in connection with the hatching of poultry constitute agricultural labor only
> if such services are performed on a farm. Thus, services performed in
> connection with the operation of a hatchery, if not operated as part of a
> poultry or other farm, do not constitute agricultural labor.

26 C.F.R. § 31.3121(g)-1(b).

In addition to these statutes and regulations, the DOL's most recent pronouncement regarding the H-2A program is a document containing a series of frequently asked questions ("FAQs") and responses, which DOL distributed on October 23, 2019 in response to the controversy that gave rise to this case. *See* 2010 H-2A Final Rule FAQs: Round 14: H-2A Definition of Agricultural Labor or Services ("H2-A FAQs"), Oct. 23, 2019 [Dkt. #1-6].[3] Of course, these FAQs have not gone through any formal rulemaking process, but they do provide evidence of and explanations for the DOLs latest thinking on the matters at issue here.

## II.    The H-2A Application and Appeal Process

In order to obtain an H-2A Temporary Labor Certification ("TLC"), an employer must go through a multi-step application process, the relevant parts of which can be summarized as follows: First, the employer submits a "job order" to a state agency between sixty and seventy-five days before the labor is needed. *See* 20 C.F.R. § 655.121(a). The state agency checks for compliance with DOL regulations, classifies the type of job the employer seeks to fill, and attempts to recruit U.S. workers to fill that job.

---

[3] Available at https://www.foreignlaborcert.doleta.gov/pdf/H-2A-2010-Rule-FAQs_Round-14_Definition-of-Ag.pdf.

*See id.* § 121(b)(1), (c). Second, while the state agency is completing these steps, the employer submits an H-2A application and supporting documentation to the DOL no less than forty-five days before the labor is needed. *See id.* § 655.130(b). Third, DOL employees then review the application for compliance with all applicable program requirements. *See id.* § 655.140(a). Within seven days of receiving the H-2A application, a DOL Certifying Officer ("CO") issues either a Notice of Acceptance ("NOA") or a Notice of Deficiency ("NOD"). *Id.* §§ 655.141(a), 655.143(a). NODs identify the reasons the employer failed to meet the H-2A program's criteria and, if applicable, list the modifications required for acceptance. *See id.* § 655.143(b). If the employer submits modifications, the CO will review and either accept or deny the modified application.

When their application for an H-2A TLC is denied, an employer has seven days to request either an expedited administrative review by, or a de novo administrative hearing before, an Administrative Law Judge ("ALJ"). *See id.* §§ 655.164(b), 655.171. If the employer does not request such a review within seven days, the CO's decision is final. *See id.* § 655.164(c). If the employer requests an expedited review, the ALJ will review the written record and any written submissions within five days of receiving the administrative record and either affirm, reverse, or modify the CO's decision, or remand to the CO for further action. *See id.* § 655.171(a). If the employer requests a de novo hearing, the ALJ will schedule a hearing for within five days of receiving the administrative record, consider any new evidence, and render a decision affirming, reversing, or modifying the CO's determination, or remand to the CO for further action,

5

within ten days of the hearing. *See id.* § 655.171(b). The ALJ's decision after either an expedited review or a de novo hearing is the final decision of the Secretary. *See id.* § 655.171.

## III.    H-2A Agricultural Labor Contractors

Plaintiffs Everglades and Statewide are agricultural labor contractors ("ALCs"), also known as H-2A Labor Contractors. In laymen's terms, these ALCs contract with growers to provide them needed labor and then use the H-2A program to hire foreign workers to complete this labor. More formally, DOL regulations define an ALC as:

> Any person who meets the definition of employer[4] under this subpart and is not a fixed-site employer, an agricultural association, or an employee of a fixed-site employer or agricultural association, as those terms are used in this part, who recruits, solicits, hires, employs, furnishes, houses, or transports any worker subject to [the H-2A program].

20 C.F.R. 655.103(b).

### A. Everglades Harvesting and Hauling, Inc.

Plaintiff Everglades was founded in 1991 to provide harvesting and hauling services to small and medium sized fruit and vegetable growers in southwest Florida. *See*

---

[4] Employer is in relevant part defined as:
> A person (including any individual, partnership, association, corporation, cooperative, firm, joint stock company, trust, or other organization with legal rights and duties) that:
>
> > Has a place of business (physical location) in the U.S. and a means by which it may be contracted for employment;
> >
> > Has an employer relationship (such as the ability to hire, pay, fire, supervise or otherwise control the work of employee) with respect to an H-2A worker or a worker in corresponding employment . . . .

20 C.F.R. 655.103(b).

Decl. of Paul J. Meador, Jr. ("Meador Reply Decl."), Pl.'s Mem. in Further Support of

Mot. for P.I. ("P.I. Reply") [Dkt. #12], Ex. 2 at 1. Over the following years, Everglades

began to rely on the H-2A program as "the only reliable means of obtaining capable and

willing agricultural laborers" for its harvesting operations. *Id.* These days, Everglades

has grown to provide harvesting, hauling, grove management, and other agrimanagement

services to fruit and vegetable growers throughout the state of Florida. *See* Decl. of Paul

J. Meador, Jr. ("Meador Decl."), Mot. for P.I. Ex. 1 ¶ 3. And over the past five years, the

company has come to rely on the H-2A program to find workers to haul harvested crops

to the first point of processing or packing. *See* Meador Reply Decl. at 1–2. To that end,

the DOL has certified applications filed by Everglades for H-2A workers in connection

with truck driving positions over the past several years:

- 9 "agricultural equipment operators" whose job duties included "hauling citrus to plants" in 2017;
- 30 "agricultural equipment operators" whose job duties included "the collection and hauling of crops from groves and fields to designated work sites" in 2018;
- 30 "truck drivers" whose job duties included "the collection and hauling of crops from groves and fields to designated work sites" in 2018.

Meador Decl. ¶ 4; Decl. of Brian D. Pasternak ("Pasternak Decl."), Gov'ts Opp'n to P.I.

Mot. ("P.I. Opp'n") [Dkt. #10], Ex. 1 ¶ 17(a), (c), (d).

This year, on August 16, 2019, Everglades applied[5] to DOL to obtain a TLC for 44

"heavy and tractor-trailer truck drivers" to assist in loading and hauling raw sugarcane

from farms and fields to a centralized processing mill. *See In the Matter of Everglades*

*Harvesting and Hauling, Inc.*, Nov. 8, 2019 Decision & Order Affirming Denial of

---

[5] The record reflects that plaintiff FFVA submitted this application on behalf of
Everglades. *See* Everglades ALJ Decision, *infra*, at 2.

Certification ("Everglades ALJ Decision") at 2[6]; *see also* Pasternak Decl. ¶ 16(e)

(identifying this Everglades ALJ decision). But this time, DOL issued a NOD, finding a

failure to establish that the job opportunity consisted of agricultural labor of services for

purposes of participation in the H-2A program.[7] *See* Everglades ALJ Decision at 2. To

say the least, Everglades viewed this as the DOL applying a new, narrower, interpretation

of the regulations to H2A applications. Everglades responded to the NOD by submitting

several exhibits, including a copy of its 2018 tax return, and contended that its proposed

job opportunity met the IRC definition of agricultural labor. *Id.* at 3. Additionally,

Everglades represented that "[o]f the estimated hours worked by [its] drivers, 60 percent

of their workweek hours takes place on the sugarcane farm property." *Id.* The CO

rejected these arguments and issued a denial letter on September 17, 2019. *See id.*

Everglades filed for an expedited administrative review before an ALJ, and a hearing was

held on October 22, 2019. *See id.* at 4. Everglades and DOL filed additional briefing on

November 1, 2019, and the ALJ issued his decision affirming the CO's denial of the TLC

on November 8, 2019.

As a result of this decision, Everglades represents that it is losing $86,000 per

week, totaling $430,000 at the time of plaintiffs' reply brief, and that it expects to lose

---

[6] Available at https://www.oalj.dol.gov/DECISIONS/ALJ/TLC/2019/EMPLOYMENT
_AND_TRAIN_v_EVERGLADES_HARVESTIN_2019TLC00088_(NOV_08_2019)_1
21657_CADEC_PD.PDF.

[7] The NOD referenced other reasons for the initial denial, but the ALJ later concluded
that the CO's final determination to deny Everglades a TLC was based solely on this
ground. *See* Everglades ALJ Decision at 2 n.2.

over $4.7 million dollars over the course of this season. Meador Reply Decl. at 2. This loss represents over 21% of Everglades's total projected revenue. *Id.*

### B. Statewide Harvesting and Hauling, LLC

Plaintiff Statewide contracts with growers to provide labor to harvest crops and transport those crops to off-side storage and processing locations. Compl. ¶ 14. DOL has certified two applications filed by Statewide for H-2A workers in connection with truck driving positions over the past two years:

- 5 "truck drivers" whose job duties included "hauling crops from groves and fields to designated processing and packing facilities" in 2018;
- 6 "truck drivers" whose job duties included "hauling crops from groves and fields to designated processing and packing facilities" at the beginning of 2019;

*Id.*; Pasternak Decl. ¶ 17(e), (f). When Statewide applied for a TLC for three truck drivers for this season, however, its application, like that submitted by Everglades, was denied. *See* Pasternak Decl. ¶ 19.

### C. Sugarland Ag, LLC

Sugarland Ag, LLC ("Sugarland") is not a named plaintiff in this case, but it is a NCAE member and therefore falls within the scope of plaintiffs' proposed injunction. P.I. Reply at 10; Decl. of William Wilkes, II ("Wilkes Decl."), P.I. Reply Ex. 3 [Dkt. #13-1] ¶¶ 1–2. Sugarland was started by the Wilkes family in May 2018 to provide sugarcane harvest hauling and other services to Florida sugarcane growers through a contract with the Sugarcane Growers Cooperative of Florida ("SCGC"). Wilkes Decl. ¶ 1. DOL certified one previous application filed by Sugarland for fifteen drivers to haul sugarcane during the 2018–2019 season. *Id.* ¶ 4. Based on the successful completion of

that work, Sugarland "substantially increased [its] scope of planned operations" for 2019–2020 and took on debt to finance the planned expanded operation. *Id.* ¶¶ 5, 7. As part of this expansion, Sugarland applied for a TLC for sixty-five drivers to haul sugarcane during 2019–2020. *See id.* ¶ 5. DOL denied Sugarland's application in September 2019.[8] As a result of this denial, and because Sugarland increased its operations this year, the company stands to lose $1,370,619.66. *Id.* ¶ 9; *see also id.* ¶¶ 10–22 (explaining the basis for this calculation). This total does not include any possible liability to SCGC for failing to deliver on its contract. *Id.* ¶ 7. The company's managing member represents that these losses will be unrecoverable absent being able to mitigate them unless it is immediately able to begin its planned hauling activities. *See id.* ¶¶ 23, 25.

Plaintiffs contend that each of these H-2A ALCs (and one other, Fresh Harvest) will suffer irreparable injury if injunctive relief is denied by this Court.

## ANALYSIS

### I.  Standard of Review

The factors a court must weigh in deciding whether to grant a preliminary injunction are familiar: (1) whether the plaintiffs have a substantial likelihood of success

---

[8] The precise date is not in the record but can be inferred from the date Sugarland's ALJ appeal commenced. *See* Notice of Docketing & Pre-Hr'g Order, *In the Matter of Sugarland AG, LLC*, https://www.oalj.dol.gov/DECISIONS/ALJ/TLC/2019/In_re_SUGARLAND_AG_LLC_2019TLC00087_(NOV_07_2019)_160144_ORDER_PD.PDF (reflecting September 23, 2019 docketing). Sugarland's request for a de novo hearing is still pending (and is, in fact, on hold pending the outcome of this motion). *See* Order to Submit Status Rep., *In the Matter of Sugarland*, https://www.oalj.dol.gov/DECISIONS/ALJ/TLC/2019/EMPLOYMENT_and_TRAIN_v_SUGARLAND_AG_LLC_2019TLC00087_(NOV_15_2019)_165704_ORDER_PD.PDF.

on the merits; (2) whether the plaintiffs would suffer irreparable injury in the absence of preliminary relief; (3) whether the balance of equities tips in their favor; and (4) whether the requested injunction would further the public interest. *Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019). The last two factors merge when the Government is the opposing party. *Id.* A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff[s] [are] entitled to such relief," and the plaintiffs bear the burden of persuasion in seeking preliminary relief. *Id.* (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal quotation marks omitted)).[9]

## II.     Plaintiffs Demonstrate That Injunctive Relief Is Warranted.

At first blush, it might appear that plaintiffs seek injunctive relief in the form of an order from this Court directing the DOL to immediately grant TLCs to those falling within the scope of its proposed relief. But as the plaintiffs themselves recognize, such an order is not, for obvious reasons, an option. *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999). Instead, they seek a more appropriate remedy: remand back to the agency of those applications that were filed by ALCs that had previously received TLCs and that were filed this year *before* the DOL released its FAQ document in late October. In essence, they seek a reevaluation of their applications under the DOL's "old" standard, which had previously resulted in the applications being granted.

---

[9] Whether the "sliding scale" approach to injunctive relief, whereby a strong showing on one factor can outweigh a weak showing on another, survives the Supreme Court's decision in *Winter* "remains an open question" in the D.C. Circuit. *Aamer v. Obama*, 742 F.3d 1023, 1403 (D.C. Cir. 2014).

The DOL, not surprisingly, argues strenuously that there is no "old" standard and that plaintiffs are not entitled to TLCs under any reading of the INA and its applicable regulations. Although I agree that there is no coherent, clearly designated, "old" standard, I disagree that there is *no* reading of the law under which the plaintiffs could be granted TLCs. After all, similar applications by these same companies had been granted on numerous occasions in prior years. As I explain below, I believe the plaintiffs have the better of the legal argument here, especially in light of the reliance interests stake. Therefore, I will remand this limited group of applications back to the DOL for reevaluation.

### A. Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs underlying suit seeks relief under the APA, which requires a court to set aside agency action it finds to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . in excess of statutory jurisdiction, authority, or limitations; or short of statutory right; . . . [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). Judicial review of DOL's regulations construing the portion of the INA authorizing the H-2A program, *see* 8 U.S.C. § 1101(a)(15)(H)(ii)(a); 20 C.F.R. § 655.103(c), must be accorded due deference under *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). DOL's interpretation of its own regulations is entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997), if such deference is warranted. *See generally Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

The DOL essentially contends that under the INA and its regulations, hauling activities performed off the farm site cannot be "agricultural labor or services" unless performed in the employ of a farmer. *See* P.I. Opp'n 10, 15, 23; Pasternak Decl. ¶ 10. It further contends that H-2A workers may perform only agricultural labor or services and that any non-agricultural labor job duties render a job ineligible to be filled by an H-2A worker. *See* P.I. Opp'n 7. Plaintiffs disagree with both contentions, although their arguments have evolved over the course of the briefing in this case. First, plaintiffs contend that the term "agricultural labor or services" is properly read to include hauling off the farm site as long as it is performed incident to harvesting and even when done by ALC employees. *See* Compl. ¶ 20 (relying on the term "including" in the INA); Mem. in Support of P.I. Mot. [Dkt. #6] at 4–5 (repeating argument based on "including" and adding arguments about inadequate notice and reliance interests); P.I. Reply at 2–8 (repeating notice and reliance arguments and adding argument based on the IRC definition of agricultural labor). Second, plaintiffs contend that the DOL has misinterpreted Congress's intent in separating the original H-2 program into separate agricultural (H-2A) and non-agricultural (H-2B) programs. P.I. Reply at 3.

Plaintiffs, of course, bear the burden of persuasion.[10] As such, I will focus on their arguments first. Initially, they contend that the IRC definition of "agricultural labor,"

---

[10] Preliminarily, I reject the argument that use of the word "including" in the statute authorizing the H-2A program contradicts the DOL's present interpretation of the term "agricultural labor or services." It is true, as plaintiffs contend, that the word "including" in the statute must mean something, but even if Congress's use of that word required the DOL to expand the definition of "agricultural labor or services" beyond the IRC definition of agricultural labor, the FLSA definition of agriculture, and the pressing of

covers their situation. As a reminder, the statutory and regulatory scheme I set out above defines "agricultural labor or services" to include "agricultural labor as defined and applied in sec. 3121(g) of the Internal Revenue Code," 20 C.F.R. § 655.103(c), which itself "includes all service performed . . . on a farm, in the employ of any person, . . . in connection with . . . harvesting any agricultural . . . commodity . . . ." 26 U.S.C. § 3121(g)(1). Plaintiffs' argument is that "hauling freshly-harvested crops to storage or processing is inextricably linked with (thus, 'in connection with') the . . . harvesting of those crops." P.I. Reply 6.[11] Indeed. At least, so long as this hauling incident to harvesting occurs on the farm site, it seems to fit squarely within the IRC's definition of agricultural labor. However, to the extent plaintiffs argue that hauling *off* the farm site by their employees qualifies as agricultural labor, none of the FLSA or IRC definitions seems to fit squarely with that interpretation.

Second, the plaintiffs contend that the DOL misinterprets congressional intent in the way it imposes a rigid separation between agricultural and non-agricultural labor. This argument, as I understand it, is that the inclusion of some job duties that do not constitute agricultural labor should not, at least automatically, defeat plaintiffs' applications for H-2A TLCs. *See* Draft Tr. of P.I. Hr'g 7 ("[T]he work involved some work in the harvest so the same people that are driving would also be part of the harvest

---

apples for cider, the DOL did so: it added "logging employment" to the definition. *See* 20 C.F.R. § 655.103(c). Granted, this is not a large expansion of the statutory definition, but to the extent the DOL was required to give effect to the word "including," it did so.
[11] This language from plaintiffs' brief actually references 26 U.S.C. § 3121(g) subsection (3) instead of subsection (1), but the former applies only to a small class of specially-defined tree-gum products while the former applies far more broadly. Still, I think their textual interpretation is sound.

crew. The interpretation from the Department of Labor, though, was that they can't leave that farm essentially. They're locked into that parcel of land.").

Before weighing the plaintiffs' construction of the DOL's regulation against its own, however, I must determine how much deference to accord the DOL's interpretation. Here, the reliance interests and lack of prior announcement lead me not to accord *Auer* deference to the DOL's apparent construction of its own regulation. How so?

The Supreme Court's decision in *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012), is instructive in answering this question. There, a group of sales representatives sued their pharmaceutical company employers for failure to pay overtime under the FLSA. *See id.* at 150–52. The employers argued that the sales representatives fell under the FLSA exemption for "outside salesm[e]n," under DOL regulations and so did not need to be paid overtime. *See id.* at 152. In response, the sales representatives pointed to a recent interpretation by the DOL contradicting this argument. *See id.* The DOL had announced this interpretation for the first time in an amicus brief filed in a similar case then on appeal. *See id.* The Supreme Court first concluded that although DOL's regulations were entitled to *Chevron* deference, the interpretation of those regulations at issue in the case was not entitled to *Auer* deference. *See id.* at 159. Writing for the Court, Justice Alito explained that such deference was unwarranted because:

> Petitioners invoke the DOL's interpretation of ambiguous regulations to impose potentially massive liability on respondent for conduct that occurred well before that interpretation was announced. To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties "fair warning of the

conduct [a regulation] prohibits or requires." *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986). Indeed, it would result in precisely the kind of "unfair surprise" against which our cases have long warned. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170–41 (2007); . . . *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 158 (1991) (identifying "adequacy of notice to regulated parties" as one factor relevant to the reasonableness of the agency's interpretation); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974) (suggesting that an agency should not change an interpretation in an adjudicative proceeding where doing so would impose "new liability . . . on individuals for past actions which were taken in good-faith reliance on [agency] pronouncements" . . . .).

*Id.* at 155–57.

The parallels to this case are undeniable. Here, as in *Christopher*, the plaintiffs relied on one interpretation of DOL's regulations in organizing their businesses, and here, as in *Christopher* the DOL announced (the DOL, of course, would say clarified) its much narrower interpretation of its regulations *after* that reliance had occurred. Indeed, in evaluating the reliance interests at play in *Christopher*, the Supreme Court found it especially important that "despite the industry's decades-long practice of classifying [outside pharmaceutical sales representatives] as exempt employees, the DOL never initiated any enforcement actions with respect to [these sales representatives] or otherwise suggested that it thought the industry was acting unlawfully." *Id.* at 157. And it added that where "an agency's announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction, the potential for unfair surprise is acute." *Id.* at 158. The Court quoted approvingly from a Seventh Circuit decision explaining that "while it may be 'possible for an entire industry to be in violation of the [FLSA] for a long time without the Labor Department noticing,' the 'more plausible hypothesis' is that

the Department did not think the industry's practice was unlawful." *Id.* (quoting *Dong Yi v. Sterling Collison Ctrs., Inc.*, 480 F.3d 505, 510–11 (2007)). All this reasoning applies even more forcefully in the present case, where the ALCs relied *not* on silence or tacit acquiescence by DOL but on it actually approving their applications year after year after year!

The Court in *Christopher* also pointed to a policy rationale underlying its decision, warning that the practice of deferring to agency interpretations of ambiguous regulations "creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby 'frustrat[ing] the notice and predictability purposes of rulemaking.'" *Id.* (quoting *Talk America, Inc. v. Mich. Bell Telephone Co.*, 564 U.S. 50, 69 (2011) (Scalia, J., concurring)). Again, this policy rationale is even stronger here. If agencies can promulgate ambiguous regulations, lull industry stakeholders into a false sense of security by granting years' worth of applications under those regulations, and then suddenly shift gears, deny applications, and claim that the time to challenge the regulation has passed,[12] those ambiguous regulations could fail to provide "fair warning" and evade any sort of judicial review.[13]

---

[12] *See* P.I. Opp'n 15 n.9 (claiming any challenge to the DOL regulation defining "agricultural labor or services" itself is barred by the six-year statute of limitations on actions against the United States).

[13] There is no indication of bad faith on the DOL's part here. The DOL claims that it has always held a consistent interpretation and mistakenly approved these prior applications, and there is no reason to doubt that explanation. But because the ALCs were not on notice of this consistent, uniformly-applied mistake, the DOL's good faith is irrelevant.

Thus, the Court in *Christopher* declined to grant *Auer* deference to the DOL's interpretation of its regulation, instead according it "a measure of deference proportional to the 'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Id.* at 159 (*quoting United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)). That approach makes good sense here as well.[14]

At oral argument, and in the FAQ document it issued last month, the DOL pointed to the text of IRC provision defining "agricultural labor" and Treasury regulations for its argument that plaintiffs' hauling activities are not "agricultural labor or services" within the meaning of the INA and the DOL's regulations. To the extent the DOL argues that any activity incident to harvesting performed by ALC employees (i.e., non-farm employees) is no longer agricultural labor once those ALC employees leave the farm site, I agree. *See* 26 C.F.R. § 31.3121(g)-1(b)(1) (limiting agricultural labor to "[s]ervices performed *on a farm*" (emphasis added)). However, to the extent the DOL argues that hauling is not "agricultural labor" even on the farm site, I must disagree in the face of contrary statutory and regulatory language.

The DOL additionally contends that even if ALC employee hauling activities constitute "agricultural labor or services" when on the farm site, H-2A TLCs may only be

---

[14] I do not believe the DOL's interpretations of the INA in the context of adjudicating a TLC is the sort of the decision that is entitled to *Chevron* deference as a general matter. But even if it could be, *see, e.g., Citizens Exposing Truth about Casinos v. Kempthorne*, 492 F.3d 460, 466–67 (D.C. Cir. 2007), I would not grant those interpretations *Chevron* deference here for the same reliance reasons I lay out above, *see, e.g., Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–27 (2016).

granted when an H-2A employee's job duties would consist *solely* of "agricultural labor or services," so the applications were properly denied. *See* P.I. Opp'n 7. DOL, not surprisingly, repeated this point *ad nauseum* in its recent FAQ publication. *See, e.g.,* H-2A FAQs ¶ 1 ("Only those duties encompassed by the Department's definition of agricultural labor or services . . . may be included on an H-2A application."), ¶ 2 (answering "No" in response to question "May I include both agricultural and nonagricultural duties on my H-2A application?"), ¶ 3 ("[A]n H-2A application for a job opportunity that contains . . . a combination of agricultural and nonagricultural duties, cannot be certified."). And the preamble to the 2010 regulation published in the Federal Register makes the same claim in explaining why the DOL modified the portion of the 2008 regulation defining "agricultural labor or services":

> The 2008 Final Rule's definition was problematic because it allowed a farmer to employ both H-2A workers and H-2B workers to perform identical work, so long as the H-2A workers and the H-2B workers were employed in different locations. *Congress clearly intended to create two separate programs: H-2A for agricultural work and H-2B for other, nonagricultural work.* Compare 8 U.S.C. 1101(a)(15)(H)(ii)(a) and 8 U.S.C. 1101(a)(15)(H)(ii)(b). A regulation that allows H-2A workers and H-2B workers to perform the same activity is inconsistent with this Congressional intent. . . .

75 F.R. 6888 (Feb. 12, 2010) (emphasis added). But the fact that Congress chose to create separate programs for agricultural and non-agricultural work does not necessarily mean that Congress intended that workers in the agricultural program could not perform

*any* other work.[15]  More importantly, despite the (mostly recent) repetition of this DOL interpretation of the INA, it is enshrined *nowhere* in actual regulations!

What's more, an examination of the broader statutory and regulatory scheme suggests that the DOL is borrowing its adherence to a strict bright line between agricultural and non-agricultural labor from the separate and distinct FLSA context. DOL regulations implementing the FLSA have long provided that an employee who would be exempt as working in agriculture under the Act loses that exemption by performing any work not defined as agriculture under the Act. *See* 29 C.F.R. § 780.11. But the incorporation of the FLSA's definition of agriculture into the INA does not mean that this rigid FLSA rule should also be incorporated.  As the Second Circuit once explained in an analogous context involving the NLRB:

> [W]hen the issue is whether a small amount of nonagricultural work converts one who would otherwise be "an agricultural laborer" under [the National Labor Relations Act] into one who is not, the questions "of policy and statutory construction" under the two acts are altogether different. Assignment of a man to covered wage and hour status under the FLSA for a

---

[15] Indeed, an admittedly preliminary review of the legislative history surrounding the enactment of the H-2A program indicates that it was created to impose more stringent obligations on prospective employers of temporary agricultural workers than temporary non-agricultural workers. *See Immigration Control & Legalization Amends. Act of 1986*, H. Comm. on the Judiciary, H.R. Rep No. 99-682, at 80 (1986) ("Recognizing the unique needs of growers and the inadequacy of current protections for farmworkers, the bill creates a separate and distinct H-2 program for agriculture, referred to in the bill as the "H-2A" program."); *see also Immigration Reform & Control Act of 1986*, Conf. Report, H.R. Rep. No. 99-1000, at 94 (1986) (noting that the final bill agreed on by the conference committee adopted the House's H-2A provisions).  As the legislation provided agricultural workers with more protections that non-agricultural workers (and thereby made it less desirable from an employer's perspective to hire agricultural workers), there is no reason to believe that Congress would be concerned about agricultural workers performing some non-agricultural work (as opposed to the alternative).

particular workweek in which he has engaged in appreciable non-exempt work has no implications for other work weeks, or other men. Labor relations know no such watertight compartments. [W]e see no reason for believing that, by regularly enacting riders incorporating the FLSA's broad definition of agriculture, Congress meant to relieve the Board of the task of developing an approach to this question of mixed work that is suitable in the light of the principles, the policies and the administrative problems of the National Labor Relations Act, and instead to permit mechanical adoption of the practice developed by the Department of Labor to meet the altogether different problems of the FLSA—particularly when this would often restrict an exemption which Congress intended to expand.

*N.L.R.B. v. Kelly Bros. Nurseries*, 341 F.2d 433, 438–39 (2d Cir. 1965). Rules relating to

FLSA exemptions are especially inapplicable here because the FLSA is a remedial statute

whose exemptions traditionally have been interpreted narrowly, *see A.H. Phillips, Inc. v.*

*Walling*, 324 U.S. 490 (1945); *but see Encino Motorcars, LLC v. Navarro*, 138 S. Ct.

1134, 1142 (2018) (rejecting this principle), whereas whether a worker performs

agricultural labor or not under the INA is subject to no such canon of construction.

To the extent the DOL sought to borrow from a different regulatory framework,

the one I would look to here is the IRC and Treasury regulations, as I am examining the

INA's definition of "agricultural labor and services" derived from the IRC. In contrast to

the FLSA context, where even a *de minimis* amount of non-agricultural work prevents an

employee from being an exempt agricultural employee, in the tax context (indeed, in the

same section of the same statute that defines "agricultural labor"), what matters is the

bare majority of an employee's work. *See* 26 U.S.C. § 3121(c) ("if the services

performed during more than one-half of any such pay period by an employee for the

person employing him do not constitute employment, then none of the services of such

employee for such period shall be deemed to be employment").

21

As such, it seems that there is little reason to accept, and good reason to doubt, the DOL's proffered (but not formally adopted) interpretation that an employer is ineligible for an H-2A TLC if the employer's application includes any non-agricultural job duties. To me, at least at this admittedly preliminary stage, the better reading of the statute and its context allows for non-agricultural work to be included, so long as agricultural work predominates.

The question, then, is whether the six applications at issue in this case would qualify even under a more relaxed standard allowing some non-agricultural work. With respect to Everglades, at least, the answer appears to be yes. *See* Everglades ALJ Decision at 3 (Everglades represented that "[o]f the estimated hours worked by [its] drivers, 60 percent of their workweek hours takes place on the sugarcane farm property."). And based on plaintiffs' representations to date, I presume the answer will be yes for the other applicants as well. But, as my accompanying order makes clear, the DOL will need to conduct this evaluation for itself.

### B. Plaintiffs Demonstrate That They Will Suffer Irreparable Harm.

Plaintiffs allege two types of harm: economic and reputational. To start with the economic harm, each H-2A ALC that has had one of its applications denied for this season faces economic losses that are certain, actual, and imminent.[16] Still, our Circuit

---

[16] The structure of the H-2A application process guarantees that this is so. In order to apply to receive an H-2A TLC, ALCs must first enter into contracts with growers for work to commence imminently and submit those contracts to state workforce agencies and the DOL. As part of certifying these applications, the state workforce agencies and the DOL must determine that there are no American workers available and willing to take these jobs. Because the applications at issue here were approved in all respects except

has long held that "economic loss does not, in and of itself, constitute irreparable harm." *Wisc. Gas Co. v. F.E.R.C.*, 758 F.3d 669, 674 (D.C. Cir. 1985). This is so because economic injuries are generally recoverable. *See id.* However, there are two exceptions to this general rule. First, "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Id.* Second, where economic loss will be unrecoverable, such as in a case against a Government defendant where sovereign immunity will bar recovery, economic loss can be irreparable. *See Save Jobs USA v. U.S. Dep't of Homeland Security*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015) (citing *Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 65–66 (D.D.C. 2004)); *see also Smoking Everywhere, Inc. v. U.S. Food & Drug Admin.*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010). Plaintiffs allege that both exceptions to the general rule on economic losses apply here. I agree.

There is strong evidence to suggest that plaintiffs' businesses will be threatened without injunctive relief. Plaintiff Everglades is facing a loss of more than 21% of its revenue and Sugarland, a member of plaintiff NCAE, is a small family company that is facing a loss of over $1 million. These H-2A ALCs are not massive entities that can withstand such losses in their core business. *See, e.g.*, *Smoking Everywhere* 680 F. Supp. 2d at 76–77 (concluding that small companies focused on importing electronic cigarettes faced irreparable injury when FDA prevented them from importing further cigarettes). What's more, even if their projected losses do not sink these small businesses, they will

---

the alleged failure to show that the workers would perform agricultural labor or services, by definition there is a contract, an imminent need for workers to perform the labor outlined in that contract, and no American workers available to perform that labor.

be unrecoverable because the plaintiffs would have no cause of action against the DOL to recover their lost money. Thus, plaintiffs' economic losses constitute irreparable harm.

Moving on to reputational harm, it is unquestionable that plaintiffs will suffer severe reputational harm if they are forced to renege on their contracts with growers, and such reputational harm will almost certainly be irreparable. Courts have recognized that such harm to a business's reputation can constitute irreparable harm sufficient to qualify for a preliminary injunction. *See Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) (grating P.I. where plaintiffs "demonstrated irreparable harm in damage to their business reputation"). Here, the structure of the H-2A visa program makes it unquestionable that at least some growers will be unable to find sufficient labor to haul their harvest and haul their crops to market absent injunctive relief.[17] *See, e.g.*, P.I. Mot., Decl. of Carlton ("Carlton Decl."), Ex. 2 [Dkt. #5-2] ¶ 6 ("The crops have been planted and cultivated, and now our growers face losses that jeopardize their ability to continue in operation."). Even if the growers whose crops are left to rot in the field manage to survive this season, it strains credulity to suggest that they would simply renew their contract with the ALCs that failed them in a previous year. Thus, the prospect of severe and unrecoverable reputational harm is certain, actual, and imminent, justifying preliminary relief in this case.

---

[17] *See* note 16 *supra*.

## C. The Balance of Equities and the Public Interest Tips Strongly in Favor of Injunctive Relief.

Once again, the third and fourth factors required for injunctive relief—balancing of the equities and the public interest—merge where a plaintiff seeks preliminary relief against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these factors weigh very heavily in favor of plaintiffs. As I have explained above, the structure of the H2-A program and its application process effectively requires serious and advanced reliance interests because ALCs must sign contracts committing to provide a certain amount of labor in order to apply for H-2A TLCs in the first place. Where, as here, the state workforce agencies and the DOL have reviewed and approved these applications,[18] it is likewise true that there is no source for this labor aside from temporary foreign workers. Thus, in binding themselves to provide labor under the H-2A program, H-2A ALCs are required to rely on previously successful applications. Where, as here, similar applications have been routinely and unanimously approved in prior years, it is only fair to conclude that the ALCs have had the proverbial rug yanked out from under them by the DOL's decision not to approve their applications this year.

Fortunately, the relief sought here is also very narrowly tailored. The plaintiffs seek only a re-evaluation by the DOL of applications filed before October 31, 2019[19] for the coming season by ALCs that previously have been granted TLCs and whose applications were denied solely on the basis of an alleged failure to include only job

---

[18] Except, of course, that the DOL did not approve the applications here on the sole issue of whether the H-2A workers would be completing solely agricultural labor or services.

[19] The date this case was filed. *See Compl.*

duties that consist of agricultural labor or services as more narrowly defined in 2019.

Plaintiffs have identified six applications to which that relief would apply. *See* Compl. ¶¶ 13, 14 (listing one application each by Everglades and Statewide); P.I. Reply 10 (listing three applications by Fresh Harvest and one application by Sugarland).[20] The DOL's own regulations require that it evaluate such applications in the first instance within seven days, *see* 20 C.F.R. §§ 655.141(a), 655.143(a), and the applications here would need to be re-evaluated as to only one factor among many, so the burden to the DOL's resources would be minimal.

The DOL points to this Court's language in a previous case for the proposition that issuing an injunction here would work great harm by subverting Congress's plenary power over the admission of aliens and substituting the Court's judgment for that of the agency Congress chose to handle these matters. *See* P.I. Opp'n 30. Of course, issuing a preliminary injunction is always a weighty matter, especially when doing so against the Government. But notwithstanding the DOL's claims to be acting pursuant to a clear congressional intent, this claim falls on skeptical ears when the DOL's interpretation here bears such a dubious legislative pedigree. It is ironic, indeed, that the DOL stresses the need for uniformity in the implementation of regulations, when uniformity with years of prior DOL decisions is precisely what plaintiffs crave.

As such, considering the balance of equities and the public interest between re-evaluating six applications for TLCs—which will expire in any event in the first half of

_____

[20] Some of these applications have finally denied while others are in the administrative appeals process. As the accompanying Order makes clear, those decisions still in the appeals process will become subject to this decision once that process has completed.

next year—on the one hand and wreaking havoc with the settled expectations of small businesses who without fair warning to the contrary very reasonably relied on the DOL's past actions on the other, I find in favor of the plaintiffs.

## CONCLUSION

Thus, for the reasons set forth above, the plaintiffs Motion for Preliminary Injunction [Dkt. #5] is GRANTED. A separate Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge